# APPENDIX 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>AKORN HOLDING COMPANY LLC, *et al.*,[1]<br><br>             Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br>(Jointly Administered) |
| GEORGE MILLER, Chapter 7 Trustee of the bankruptcy estates of Akorn Holding Company LLC, et al.,<br><br>             Plaintiff,<br><br>     v.<br><br>TUCKER COMPANY WORLDWIDE, INC.,<br><br>             Defendant. | Adv. Proc. No. 25-50214 (KBO) |

**DECLARATION OF JAMES TUCKER IN SUPPORT OF TUCKER COMPANY WORLDWIDE, INC.'S MOTION FOR SUMMARY JUDGMENT**

I, James Tucker, state the following under penalty of perjury:

1.     I am the President and COO of defendant Tucker Company Worldwide, Inc. ("Tucker") whose principal place of business is located at 56 North Haddon Avenue, Haddonfield, New Jersey 08033.

2.     I have personal knowledge of some of the matters set forth herein and, as for those matters of which I do not have personal knowledge, I believe them to be true based upon, among other things, the records that Tucker maintains and makes in the regular course of its business.

---

[1]     The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23-10255 (KBO). The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

3.      The appendices referred to in this affidavit are based on the original documents that I have in my possession and/or are based on Tucker's records as kept in the regular course of business.

4.      I submit this affidavit in support of Tucker's Motion for Summary Judgment. If I were called to testify as a witness in this case, I would competently testify to each of the facts set forth herein based on my personal knowledge or review of Tucker's documents.

5.      I am familiar with Tucker's operations, including its transactions with Akorn Holding Company LLC, Akorn Intermediate Company LLC, and Akorn Operating Company LLC (collectively, the "Debtors").

6.      Prior to the bankruptcy, Tucker had done business with the Debtors for several years. In the course of their business relationship Tucker acted as a logistics services provider and an agent between the Debtors and shipping carriers, negotiated freight rates, ensured the Debtors received the best price possible and reviewed invoices issued by the Debtors' shipping carriers to ensure they were correctly issued.

7.      During the 90-day period prior to the Petition Date from November 25, 2022 to February 23, 2023 (the "Preference Period"), the Debtors' payments averaged 49 days from the invoice date. Tucker's Ordinary Course of Business Analysis is attached as Appendix 2.

8.      During the one-year period prior to the start of the Preference Period from November 25, 2021 to November 25, 2022 (the "Historical Period"), the Debtors' payment averaged 38 days from the invoice date. *See* Appendix 2.

9.      The Debtors' payments to Tucker during the Historical Period averaged $3,230.20. *See* Appendix 2. During the Preference Period, the Debtors' payments to Tucker averaged $3,333.21. *See* Appendix 2.

10.     During the Preference Period, Tucker continued to ship goods to the Debtors. In total, Tucker provided services valued at $203,648.51 to the Debtors during the Preference Period. These services remained unpaid as of the Petition Date. Evidence of the new value provided by Tucker to the Debtors is attached as Appendix 3.

11.     Tucker did not exert any unusual collection pressure on the Debtors during the Preference Period. Tucker did not, for example, demand shorter payment terms or COD terms. Tucker did not threaten to sue the Debtors or have its attorneys call the Debtor in order to obtain payment on past due invoices. In the years prior to the Petition Date, the Debtors would typically pay Tucker's invoices with ACH transfers, with some transfers paying for multiple invoices.

12.     Finally, in its capacity as a freight broker for the Debtors, Tucker obtained independent carriers to transport goods for the Debtors as needed.  The Debtors would notify Tucker if they had a load of goods to be delivered to a particular destination. Tucker would obtain an independent carrier from its database to transport the goods for the Debtors.  The Debtors were the shipper or consignee on such shipments.

13.     The Debtors would tender the goods directly to the carrier, along with an appropriate Bill of Lading.  Upon completion of the work, the individual carriers would submit invoices associated with the Debtors' shipping activity to Tucker and Tucker would, in turn, submit invoices to the Debtors.  The Debtors would send Tucker money (*i.e.,* the Transfers), which Tucker would then distribute to carriers to settle their open carrier invoices and a portion of the Transfers would cover Tucker's fee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

TUCKER COMPANY WORLDWIDE, INC.


BY:  /s/ *James Tucker*
JAMES TUCKER
PRESIDENT AND COO